MAXWELL, J., for the Court:
¶ 1. The Itawamba County Chancery Court granted Sue Smith a divorce from her husband Billy Smith based partly on Billy’s gambling losses, which exceeded $300,000. We find Billy’s extensive dissipation of marital assets, when combined with his pattern of fraudulent conduct and unwelcome sexual advances toward Sue, satisfy the criteria for divorce based on habitual cruelty. We further find the chancellor correctly applied the law and committed no manifest error in classifying and distributing the marital property. Thus, we affirm.
FACTS
¶2. Billy and Sue married in 1965. They had one child, Billy Smith Jr., who was emancipated by the time of the trial in this case.
¶ 3. Both Billy and Sue were school teachers for many years. After retiring, they started an internet business, which sold computer software to school districts throughout Mississippi. The parties eventually sold their software business for a profit. They used some of the proceeds to start a business, Fulton Rental Properties, Inc. (“FRP”). Initially, Billy owned 50% of the stock in FRP, Sue owned 25%, and Billy Jr. owned 25%. After the parties separated, Billy Jr. sold his twenty-five-percent interest to his father for $50,000.
¶ 4. After the parties had been married for about thirty-five years, Billy developed a severe gambling addiction. He gambled away substantial sums of money — over $300,000 — from 2000 to 2007. The vast majority of the losses occurred from 2003 to 2006.
¶ 5. Billy and Sue separated in February 2006. Approximately two months later, Sue filed for divorce. Her amended complaint alleged the fault-based grounds of habitual cruel and inhuman treatment and *1262 constructive desertion. On July 7, 2009, the chancellor granted the divorce, finding Sue had proven both grounds. In dividing the property, the chancellor valued Billy’s gambling losses at $314,000. Finding Billy had committed wasteful dissipation, the chancellor ordered him to reimburse Sue one-half of this amount — $157,000. The chancellor’s overall distribution of the marital estate was roughly equal between the parties.
¶ 6. On appeal, Billy argues the chancellor erred by: (1) granting the divorce; (2) finding he had accrued $314,000 in gambling losses and ordering him to reimburse Sue for one-half of this amount; and (3) determining Billy owned no separate-property interest in FRP.
STANDARD OF REVIEW
¶ 7. “Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record.” Henderson v. Henderson, 757 So.2d 285, 289 (¶ 19) (Miss.2000). We will not disturb a chancellor’s factual findings unless the chancellor’s decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard. Wallace v. Wallace, 12 So.3d 572, 575 (¶ 12) (Miss. Ct.App.2009). We do not substitute our “judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion.” Coggin v. Coggin, 837 So.2d 772, 774 (¶ 3) (Miss.Ct.App.2003).
¶ 8. When reviewing a chancellor’s interpretation and application of the law, our standard of review is de novo. Tucker v. Prisock, 791 So.2d 190, 192 (¶ 10) (Miss.2001). A chancellor’s determination that a spouse’s conduct rose to the level of habitual cruel and inhuman treatment is a determination of law, which we review de novo. Potts v. Potts, 700 So.2d 321, 322 (¶ 10) (Miss.1997); Anderson v. Anderson, 54 So.3d 850, 851 (¶ 7) (Miss.Ct. App.2010).
DISCUSSION
I. Habitual Cruel and Inhuman Treatment
¶ 9. Billy argues the chancellor erred by granting the divorce based primarily on his gambling losses. He contends gambling can never, in itself, constitute a ground for divorce based on habitual cruelty. Sue responds that Billy’s excessive gambling, when combined with his pattern of deceptive conduct to finance his gambling, his unwelcome sexual advances, and poor hygiene, made the marriage revolting to her.
A. General Requirements
¶ 10. In Mississippi, one of the twelve fault-based grounds for divorce is habitual cruel and inhuman treatment. Miss.Code Ann. § 93-5-1 (Supp. 2011). To obtain a divorce on this ground, the plaintiff must show conduct that either:
(1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.
Richard v. Richard, 711 So.2d 884, 889 (¶ 22) (Miss.1998). The plaintiff must *1263 prove one of these two prongs by a preponderance of the credible evidence. Shavers v. Shavers, 982 So.2d 397, 403 (¶ 35) (Miss.2008).
¶ 11. In reviewing a divorce based on cruelty, “[t]here is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse.” Bodne v. King, 835 So.2d 52, 59 (¶ 24) (Miss.2003). Evaluating the impact on the offended spouse is a subjective inquiry. The focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person. Faries v. Faries, 607 So.2d 1204, 1209 (Miss.1992). The plaintiff must show a casual connection between the defendant’s conduct and the impact on the plaintiff. Id. And the defendant’s cruelty must not be too temporally remote from the separation. See Richard, 711 So.2d at 890 (¶ 23) (finding a divorce may be granted based on “habitual or continuous behavior over a period of time, close in proximity to the separation, or continuing after a separation occurs[.]”); see also Deborah H. Bell, Bell on Mississippi Family Law § 4.02[8][b]-[c] (2005) (explaining that a strict causal connection between the conduct and the separation is no longer a required element of proof).
¶ 12. Generally, the party alleging habitual cruelty must corroborate his or her own testimony. Shavers, 982 So.2d at 403 (¶ 35). An exception is made in cases where corroboration is not reasonably possible because of the nature of the accusation. Bell § 4.02[8][d]; see also Jones v. Jones, 43 So.3d 465, 478 (¶30) (Miss.Ct. App.2009). “ ‘[Cjorroborating evidence need not be sufficient in itself to establish [habitual cruelty],’ but rather ‘need only provide enough supporting facts for a court to conclude that the plaintiffs testimony is true.’” Jones, 43 So.3d at 478 (¶ 30) (quoting Bell § 4.02[8][d]).
¶ 13. To prove habitual cruelty, the plaintiff must show more than mere unkindness, rudeness, or incompatibility. Robison v. Robison, 722 So.2d 601, 603 (¶ 5) (Miss.1998). Although in cases of violence a single incident may be sufficient for a divorce, generally the plaintiff must show a pattern of conduct. See Curtis v. Curtis, 796 So.2d 1044, 1047 (¶ 8) (Miss.Ct. App.2001). When there is no violent conduct involved, we review the facts on a case-by-case basis, taking into account the frequency and severity of the conduct, as well as the impact on the plaintiff. See Bell § 4.02[9][b]. “There are many kinds of acts such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty.” Jackson v. Jackson, 922 So.2d 53, 57 (V 8) (Miss.Ct.App.2006).
¶ 14. Because it is undisputed that Billy did not create a danger to Sue’s safety, nor an apprehension of danger, we focus on the second prong of the test for habitual cruelty — whether any of Billy’s conduct was so “unnatural and infamous” that the marriage became revolting to Sue and rendered it impossible to discharge her marital duties without risk to her health.
B. “Unnatural and Infamous”
¶ 15. Our supreme court has observed “[t]he words ‘unnatural and infamous’ have not been precisely defined by precedent because the plain meanings of those words are sufficient.” To determine the plain meaning of words, we look to their dictionary definition. Gilmer v. State, 955 So.2d 829, 834 (¶ 13) (Miss.2007). The American Heritage Dictionary 1956 (3d ed. 1992) de *1264 fines “unnatural” as “[d]eviating from a behavioral or social norm[.]” “Infamous” means “[clausing or deserving infamy; heinous[.]” Id. at 924.
¶ 16. In McIntosh v. McIntosh, 977 So.2d 1257, 1267 (¶¶ 37-38) (Miss.Ct.App. 2008), this court found a wife’s conduct relating to the parties’ finances amounted to habitual cruelty under the “unnatural and infamous” prong. The wife in McIntosh forged her husband’s name to savings bonds, cashed them without notifying him, and pretended to help him look for them afterward. We found: “Such acts certainly qualify as conduct that could have rendered the marriage revolting ... and could have made it impossible ... to discharge the duties of marriage.” Id. at 1267 (¶ 38). In Jones, 43 So.3d at 471-72 (¶ 10), 473-74 (¶¶ 15-16), 477-78 (¶¶26, 29), we found a husband’s substantial gambling losses — when combined with his verbal abuse and sexual demands — rose to the level of habitual cruel and inhuman treatment. Though proof of the gambling losses was limited, the wife testified the losses were $100,000. Id. at 471 (¶ 10).
C. Chancellor’s Findings
¶ 17. The chancellor thoroughly analyzed this issue. She granted the divorce because “the cumulative effect of Billy’s conduct ... rendered the marriage intolerable for Sue.” Her findings included that:
[T]he undisputed proof is that Billy has been heavily involved in gambling for an extended period of time, but the proof was not limited to that activity alone. The credible proof established that Billy’s gambling activity had reached such intensity for him that he utilized the income and available credit of one of the closely-held corporations created during the parties’ lengthy marriage in order to fund his hobby, which has led to his repeated failure to provide an accounting of his finances with regard to gambling on multiple occasions throughout this litigation and deterioration in his care of the marital home and business interests. While Sue may have accompanied Billy [to the casinos] on a few occasions several years ago, she after-wards denounced his gambling to excess and the credible proof established that his gambling was indeed excessive and particularly onerous to her. Additionally, Billy’s hygiene and sexual demands were offensive to Sue to the degree that she could not share a bedroom with him.
D. Billy’s Habitual Cruelty
¶ 18. Billy claims the chancellor should not have focused so heavily on his gambling losses which totaled over $300,000. However, we find it is certainly significant that after thirty-five years of marriage, Billy suddenly became an excessive gambler and unilaterally squandered hundreds of thousands of dollars in marital assets over a relatively short period of time. And we point out, Billy’s gambling was not the sole impetus for the chancellor’s cruelty finding. In addition to the financial devastation Billy caused and its effect on Sue, the chancellor also looked to the dishonest methods Billy utilized to finance his habit, and his sexual demands of Sue.
¶ 19. Although Billy downplays the legal significance of his fraudulent conduct to obtain financing to further his gambling, we find in this particular case, the deceptive means Billy used to pursue his habit are perhaps as significant as the dissipation itself. There is no dispute that Billy utilized the parties’ businesses to fund his gambling. From 2003 to 2006 alone, he expended over $300,000 from their business accounts. He also stripped their *1265 rental-property business of essentially all profits during this time. The record shows Billy made no less than three material misrepresentations to financial institutions in obtaining loans. The false statements included: (1) in 2001, he mortgaged the marital home and claimed on loan documents to be an “unmarried” man; (2) he forged Sue’s signature on loan documents in 2003 to increase the line of credit on the marital home to $250,000; (3) in 2002, he again forged Sue’s name to obtain a loan of $127,000. And in 2006, Billy secretly obtained a $19,200 home-equity loan on the marital home. Sue discovered this loan when she performed a title search in preparation for the divorce action.
¶ 20. According to Sue, Billy was solely responsible for managing their business finances, thus allowing him to conceal the extent of his gambling for a considerable time. Sue claimed Billy had lied to her about how much money he had lost, telling her he had lost “hundreds,” when he had lost many “thousands.” She did not realize the extent of Billy’s gambling problem until March 2005, when she discovered bank and credit-card statements reflecting Billy’s immense expenditures. Sue claimed, “[she] was floored” and explained that “[she] tried to get him to stop ... [but] couldn’t even talk to him. [She] couldn’t even penetrate. He paid no attention to what [she] said.”
¶ 21. In her cruelty analysis, the chancellor also noted Sue’s testimony that Billy attempted to perform oral sex on her without her consent and “tried to force [her] legs apart ... with force.” Sue described another occasion where, in her words, “he tried to do anal sex and I jumped and told him he had better not ever do that again.” Sue accused Billy of viewing pornography often, which she thought “was the reason that he couldn’t perform as well naturally.” Sue also testified Billy had “loose bowels” and would often get into bed with her wearing soiled underwear. Sue claimed Billy “refused to wash, clean up. And this was at least five times a week most weeks.” Even after Sues laid out clean underwear for Billy, he refused to change out of his soiled ones. Sue explained the odor was so revolting to her that she frequently slept in a separate room.
¶ 22. Habitual cruelty may be found from a series of acts, “such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty.” Jackson, 922 So.2d at 57 (¶ 8). We find no error in the chancellor’s decision that Billy’s behavior, taken as a whole, constitutes habitual cruelty. His qualifying conduct includes not only his gambling losses of over $300,000, but his series of intentional, often dishonest, and possibly criminal acts, through which he dissipated the parties’ assets to fund his gambling addition. His sexual and personal-hygiene issues that rendered the relationship revolting to Sue also factored into the chancellor’s cruelty finding.
¶ 23. Considering whether Billy’s behavior is “unnatural” — deviating from societal norms — and deserving of labels such as “heinous” or “infamous,” we note it is similar to conduct we found amounted to habitual cruelty in both Jones and McIntosh. Like the fraud displayed in McIntosh, Billy forged his wife’s signature on financial documents. And much akin to the husband in Jones, Billy gambled away exorbitant sums of money and made un-welcomed sexual demands. Notably, Billy’s gambling losses were considerably *1266 more extensive than the substantial losses in Jones. Billy also resorted to various deceptive methods to obtain loans to fund his habit.
¶ 24. Billy cites several cases we find unavailing to his argument. In Curtis v. Curtis, 796 So.2d 1044, 1046-47 (¶¶3, 7-10) (Miss.Ct.App.2001), we determined a wife’s gambling losses, which forced the parties to refinance their house to pay off credit cards and other small loans, were not sufficiently devastating to meet the supreme court’s definition of habitual cruelty. Though observing “gambling has not been found per se to be cruel and inhuman treatment,” we explained gambling could constitute habitual cruelty if it arose to the level defined by the Mississippi Supreme Court. Id. at 1047 (¶ 8). Here, we find Billy’s overall conduct rises to that level. We distinguish Curtis because: (1) Billy’s gambling losses were much more considerable than those in Curtis; and (2) Billy engaged a pattern of dishonest behavior in incurring the gambling debt.
¶ 25. In Criswell v. Criswell, 254 Miss. 746, 182 So.2d 587 (1966), the supreme court addressed a wife’s gambling and found that it did not rise to the level of habitual cruelty. But in Criswell, unlike this case, the wife’s gambling was “condoned by [the husband] for many years.” Criswell, 254 Miss, at 758, 182 So.2d at 590. While Sue might have accompanied Billy to the casino about six times, she did not condone the vast majority of his substantial gambling debt — as the chancellor found. This conclusion is bolstered by Lowrey v. Lowrey, 25 So.3d 274, 289 (¶ 36) (Miss.2009), where the supreme court found one spouse’s limited gambling on a few occasions did not condone the other spouse’s gambling losses of over $122,000. Sue, likewise, did not condone Billy’s gambling.
¶ 26. Billy also suggests Sue has not shown the necessary detrimental impact on her health. The Mississippi Supreme Court has explained that assessing the impact of cruelty on the plaintiff is a subjective test. Faries, 607 So.2d at 1209. But the court has required an objective showing of harm to that spouse’s health and well-being. See id. at 1209 (citing Bias v. Bias, 493 So.2d 342, 345 (Miss.1986) (explaining that the harm may be emotional or physical); see also McIntosh, 977 So.2d at 1264-66 (¶¶ 27-30); Bell § 4.02[8][b]. The court has made no exception for claims proceeding under the “unnatural and infamous” prong.
¶ 27. Here, the chancellor found Billy’s gambling had “adverse effects” on Sue, which were “particularly onerous to her.” And due to the couple’s financial collapse, Sue “continued to be devastated by the amount of money Billy lost ... gambling.” The chancellor also found credible Sue’s testimony that she had trouble sleeping and suffered from depression. The chancellor further relied on testimony from Sue’s brother, William Yielding, that on two occasions, Yielding had to go to Sue’s house “and calm her down because of what Billy said” to her. On one such occasion, Yielding observed Sue “nervous” and “about to have a breakdown.” Yielding recalled, “She couldn’t even breath[e].” Yielding testified this reaction was in response to a phone call from Billy. During this call, Billy allegedly falsely claimed their son Billy Jr. “was sick or in an accident or something to that effect [which] got her all upset. Said that she didn’t care anything about [their son] or something like that and just got her all messed up.” As a result, an ambulance had to be called. When paramedics arrived, Yielding “stayed with her a little *1267 while” untü they could “get her to where she could breathfe.]”
¶ 28. We find no manifest error in the chancellor’s finding that Sue had proven a sufficient adverse impact on her health. The evidence supports that the marriage was so revolting to Sue that she could no longer continue her marital duties without risk to her health. See Kergosien, 471 So.2d at 1209 (quoting Howard v. Howard, 248 Miss. 301, 308-304, 138 So.2d 292, 293 (1962) (“The cruelty ... [must] render further cohabitation impossible, except at the risk of life, limb, or health on the part of the unoffending spouse[.]”). We found similar health concerns sufficient in McIntosh. McIntosh, 977 So.2d at 1264-66 (¶¶ 26-30). While Sue offered no expert medical testimony on the point of her health, this is not required. See id. (applying Kergosien, 471 So.2d at 1210).
¶ 29. We reject Billy’s argument that the Mississippi Legislature’s refusal to adopt gambling as a fault-based ground for divorce has a bearing on the issue before us. That the Legislature has not made gambling its own ground for divorce does not mandate that gambling cannot combine with other factors to satisfy the existing ground of habitual cruelty. Cf. Jones, 43 So.3d at 473-74 (¶¶ 15-16), 477-78 (¶¶ 26, 29).
¶ 30. For these reasons, we find Billy’s overall conduct sufficient to support a divorce based on habitual cruelty. So we need not reach the chancellor’s alternative finding of constructive desertion.
il. Gambling Losses
A. Valuation
¶ 31. Billy argues the chancellor erred in finding him responsible for reimbursing Sue for one half the amount of his gambling losses. He also claims the chancellor’s $314,000 valuation of his gambling debt is inaccurate and clearly erroneous. In ordering an equitable distribution, chancellors are directed to (1) classify the parties’ assets as marital or separate property, (2) determine the value of those assets, and (3) divide the marital estate equitably based upon the factors set forth in Ferguson. Larue v. Larue, 969 So.2d 99, 104 (¶ 11) (Miss.Ct.App.2007) (citing Ferguson v. Ferguson, 639 So.2d 921, 928-29 (Miss.1994)).[1] We review a chancellor’s valuation of assets for an abuse of discretion. See Christopher v. Christopher, 766 So.2d 119, 122 (¶ 13) (Miss.Ct.App.2000).
1132. Sue utilized several methods to prove the extent of Billy’s gambling losses. She subpoenaed Billy’s gambling records from 2000 forward and presented expert testimony from Chris Jones, CPA. Utilizing the “coin in/coin out” method to evaluate the casino records,[2] Jones determined Billy wagered approximately $1.5 million from 2000 to 2007 and “won” approximately $1.2 million. Specifically, Jones determined Billy’s net gambling losses totaled $326,220. Sue also corroborated Jones’s estimates by introducing financial records of the parties’ businesses. She offered bank and credit-card state *1268 ments showing Billy had expended a total of $314,950 using the parties’ business accounts from 2003 to 2006. Further, Billy admitted that the accountant for their corporations, after preparing 2005 tax returns, had told him that as much as $400,000 had gone missing. The chancellor found Billy introduced no credible evidence refuting the amounts proven by Sue. The chancellor also prominently noted that despite multiple court-ordered account-ings, Billy was unable to explain the lost sums.
¶ 33. Billy claims the chancellor ignored his winnings from the casinos. Specifically, he argues his winnings include $121,000, which he purportedly gifted to his son, Billy Jr. Yet our review reveals Billy Jr. testified that both of his parents gave him the $121,000 amount. This figure was based on Billy Jr’s, recollection of the amounts he had received over a ten-year period. There was no documentary support for the alleged gift. Also, Billy fails to show how this $121,000 figure— even if accurate — contradicts Sue’s proof that Billy’s net gambling losses exceeded $314,000. Indeed, the methodology of Sue’s expert, Jones, accounted for winnings.
¶ 34. Because the record — including expert testimony and documentary evidence — supports the chancellor’s finding that the gambling losses totaled at least $314,000, we are unable to find manifest error in her decision.
B. Billy’s Responsibility for One-Half of Gambling Debt
¶ 35. We next consider the chancellor’s finding that Billy’s gambling losses of $314,000 constitute dissipation. We also address her finding that one-half the value of the dissipated funds ($157,000) should be deducted from Billy’s overall share of the marital estate — essentially requiring Billy to reimburse Sue for one-half of the funds he dissipated.

(1) Dissipation

¶ 36. The Mississippi Supreme Court has held: “[G]ambling losses can be considered as dissipation in an equitable distribution of marital assets.” Lowrey, 25 So.3d at 288 (¶ 34) (citing Craft v. Craft, 825 So.2d 605, 607, 611 (¶ 22) (Miss.2002)). But the Lowrey court was careful to point out: “Gambling losses are not per se dissipation. This is to be decided on a case-by-case basis.” Id. at n. 10.
¶ 37. The supreme court has not adopted a specific test to discern when one spouse’s alleged misuse of marital funds constitutes “dissipation.” Yet the court has indicated that the dissipation must be “wasteful.” See Lowrey, 25 So.3d at 288-89 (¶ 34), 291 (¶ 40) (finding gambling losses well over $122,000 constituted wasteful dissipation).[3] Indeed, the dictionary definition of “dissipate” is: “To spend or expend intemperately or wastefully; squander.” The American Heritage Dictionary 539 (3d ed. 1992). This area of law has not been thoroughly developed in Mississippi, but we find it reasonable when considering if marital assets have been dissipated to look to whether the assets in question were actually wasted or misused. Though Mississippi has no definitive standard, we note that Indiana courts consider the following factors in determining whether dissipation has occurred:
(1) whether the expenditure benefit[t]ed the marriage or was made for a purpose entirely unrelated to the marriage;
*1269 (2) the timing of the transaction;
(3) whether the expenditure was excessive or de minimis; and
(4) whether the dissipating party intended to hide, deplete, or divert the marital assets.
Thompson v. Thompson, 811 N.E.2d 888, 915 (Ind.Ct.App.2004) (citation omitted). We find this test for dissipation persuasive and note all factors favor a finding that dissipation occurred here. Billy’s gambling was for a purpose unrelated to the marriage. The gambling occurred during the time period leading up to the separation. The expenditure was excessive. And, as previously discussed,[4] Billy surreptitiously diverted marital assets to fund his gambling addiction, through a pattern of fraudulent acts. Upon discovery of the seriousness of Billy’s addiction, Sue pleaded with Billy to stop gambling, but he refused.
¶ 38. From these facts, we find no error in the chancellor’s determination that Billy’s losses constitute dissipation.

(2) Reimbursement for One-Half of Debt

¶ 39. If a debt is considered wasteful dissipation, the court should next consider what amount should be reimbursed to the marital estate (or offset from the dissipating spouse’s share of the marital estate). Here the chancellor’s order required Billy to compensate Sue $157,000, representing one-half of his total gambling losses. This sum was to be paid from the sale of the marital residence, valued at $225,000. Billy contends this award was inequitable.
¶ 40. In Lowrey, the supreme court found a spouse’s gambling losses eonstitut-ed dissipation. Lowrey, 25 So.3d at 288 (¶ 34). Though Lowrey dealt with an insolvent marital estate, unlike our present situation, the supreme court adopted this court’s analysis from Dunaway, where we considered similar facts. Id. at 290-91 (¶¶ 39-40) (citing Dunaway v. Dunaway, 749 So.2d 1112 (Miss.Ct.App.1999)). In Dunaway, we held a chancellor in error for awarding a wife 100% of the assets dissipated by her husband. Dunaway, 749 So.2d at 1119 (¶ 19). We recognized that had the husband not dissipated the assets, “they would have been in that body of assets to be equally divided, ... entitling [the wife] to approximately one-half of them.” Id. Finding the chancellor’s 100% award “took on something of a punitive aspect,” we found the proper course was to return to the non-offending spouse “the one-half that was rightfully hers[.]” Id.
¶ 41. This is the exact approach the chancellor used here. There is no dispute that the assets Billy dissipated through gambling were marital assets. Finding a roughly equal overall award was appropriate, the chancellor returned to Sue a value of one-half of the dissipated marital assets, thus following the tenets of Lowrey and Dunaway. We find no manifest error in this decision.
III. Classification of FRP
¶ 42. Billy finally argues the chancellor erred by finding the parties’ rental-property business, FRP, was entirely marital property. While it is undisputed that 75% of FRP is marital, Billy contends the chancellor erred in classifying the remaining 25% interest, which he purchased from his son following the separation,[5] as marital. *1270 This transfer occurred after the chancellor entered an agreed order, on July 14, 2006, freezing the parties’ marital and business assets.[6] In the chancellor’s judgment of divorce, she found: “[F]or the purposes of equitable division, this [agreed order] signaled the end of accumulation of marital assets by the parties.” But because she found Billy’s 25% interest “was acquired following the parties’ separation with marital funds,” the chancellor ordered FRP sold and the proceeds divided equally between the parties. (Emphasis added).
¶ 48. The beginning date for the accumulation of marital property is the date of the marriage. The ending date is the date of divorce unless there is an order, such as a separate maintenance order or temporary-support order, which cuts off the accumulation of marital property. Godwin v. Godwin, 758 So.2d 384, 386-87 (¶¶ 7-8) (Miss.1999) (finding husband’s deferred compensation plan acquired after separate-maintenance order was entered was husband’s separate property); Bell § 6.02[3][b] (“[A]n order of separate maintenance or temporary support ends marital property accumulation as a matter of law.”). But if an asset is acquired after this line of demarcation with marital property, the acquired asset is marital property. Godwin, 758 So.2d at 386 (¶ 7).
¶ 44. In this case, there was no separate maintenance or temporary-support order, only an agreed order freezing the parties’ marital and business assets. The parties do not dispute the chancellor’s determination that this agreed order was the proper line of demarcation for the accumulation of marital property. Thus we find no fault with this determination. Nor do we find error in the chancellor’s determination that Billy’s 25% interest “was acquired ... with marital funds.” At other points in the judgment of divorce, the chancellor found Billy had violated the agreed order by selling marital property ordered frozen by the court. In fact, the chancellor held Billy in contempt based on Billy’s repeated failure to comply with court-ordered accountings regarding his use of marital and business funds under the agreed order. On appeal, Billy does not challenge the chancellor’s contempt finding.
¶45. Due to Billy’s refusal to comply with court-ordered accountings, there are many uncertainties about Billy’s use of some of the marital assets following the agreed order. Billy fails to specify on appeal any documentation or testimony to refute the chancellor’s finding that he used marital assets in purchasing his son’s 25% interest in FRP. On the record before us, we are unable to discern any basis for reversal on this issue.
¶ 46. THE JUDGMENT OF THE ITAWAMBA COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE AND RUSSELL, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT. CARLTON, J., CONCURS IN RESULT ONLY. MYERS AND ROBERTS, JJ., NOT PARTICIPATING.

. The chancellor should also consider the appropriateness of alimony if either party is left with a deficiency. Lame, 969 So.2d at 104 (¶11).

. Jones explained that under this method, he analyzed the casino’s "independent tracking of coin-in, coin out. And simply by taking the coin-in, subtracting the coin-out, you can arrive at an individual’s net gambling activity.” Jones explained that Billy used a player rewards card to gamble, which allowed the casino to track his gambling activity. In Jones’s opinion, the "coin-in, coin out” method is generally the most accurate measure for valuing gambling losses.

. But see Bowen v. Bowen, 982 So.2d 385, 396 (¶ 47) (Miss.2008) (finding an undetermined amount of gambling losses did not constitute dissipation).

. See Issue I.

. As of the date of the divorce, Billy had paid approximately $5,000 toward his $50,000 purchase of this 25% interest.

. The agreed order provided an exception for funds “needed for the ordinary course of business and to pay regular family bills.”