# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00238-COA

**KEMILY RANKIN**                                                    **APPELLANT**

**v.**

**KELVIN RANKIN**                                                      **APPELLEE**

DATE OF JUDGMENT:            12/19/2018
TRIAL JUDGE:                 HON. VICKI R. BARNES
COURT FROM WHICH APPEALED:   WARREN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      KIMBERLY WALKER NAILOR
ATTORNEY FOR APPELLEE:       DAVID M. SESSUMS
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 REVERSED AND REMANDED - 10/06/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### BARNES C.J., FOR THE COURT:

¶1.     On December 19, 2018, the Warren County Chancery Court denied Kemily Rankin's complaint for divorce from her husband, Kelvin Rankin, on the ground of habitual cruel and inhuman treatment. Kemily appeals, claiming the chancery court erred in denying (1) her request for a divorce and (2) her motion for reconsideration or a new trial. Contrary to the chancery court's ruling, we find there was sufficient evidence to support granting the divorce on the ground of habitual cruel and inhuman treatment, and we reverse and remand for further findings in accordance with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶2.     Kelvin and Kemily were married in July 2007 and separated in November 2017. They

had two children born of the marriage.[1] On December 6, 2017, Kemily filed a "Complaint for Divorce, Petition for Temporary Relief and Petition for Temporary and Permanent Restraining Order." In the complaint, Kemily requested a divorce on the ground of habitual and inhuman treatment or, in the alternative, irreconcilable differences. Kelvin filed a counter-complaint in January 2018, likewise requesting a divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. On June 4, 2018, a temporary order was entered, awarding joint legal and physical custody of the children to both parties. The chancery court denied Kemily's request for a temporary restraining order. Prior to trial, Kelvin filed a motion to dismiss, and his counter-complaint was dismissed without prejudice.

¶3. A trial was held on October 29, 2018. Kemily testified that the couple's marital problems began as early as their honeymoon when Kelvin got upset with Kemily while talking to her sister on the phone, and the couple had a disagreement about her giving food to a homeless person. Kemily also recalled an instance where she arrived home from work to find her dog tied to a tree and foaming at the mouth because Kelvin had forced feces down its throat after the dog had an accident inside the house. Kemily testified that in 2008 or 2009, Kelvin pushed her once during an argument while she was pregnant and that he had kicked a suitcase in 2015 or 2016, which hit her and bruised her leg. On another occasion, after Kemily had locked her herself in the bathroom during a disagreement, Kelvin picked the lock on the bathroom door, followed her into the bathroom, and continued to yell at her.

---

[1] The children were born in 2009 and 2011.

Kemily testified that Kelvin had called her a b****, wh***, stupid, and dumb and that he had belittled her in front of his church congregation.[2] She claimed that the "final straw" was when Kelvin wanted to have sex one morning, and she did not; so Kelvin yelled at her and took their children to Brookhaven, telling them, "Momm[y can't] go because she ha[s] issues." Thinking she heard Kelvin's vehicle the next day, Kemily was worried that he had come back to harm her. She testified that Kelvin had also taken the children to a hotel for a few nights and would not tell her where they were, causing her distress over their whereabouts.

¶4. Kemily claimed Kelvin's behavior had affected her physical health. She testified that she suffered from intense migraines during the last five years of the marriage. Although she noted that her blood pressure was elevated, Kemily acknowledged she had never been diagnosed with high blood pressure. Kemily said her migraines and blood pressure had not been an issue since she separated from Kelvin in November 2017. She said Kelvin also inflicted emotional, mental, and spiritual harm on her and insisted that reconciliation with Kelvin was not in her best interests.

¶5. Kemily's mother, Loraine Alexander, testified that she had overheard Kelvin call Kemily stupid. In May 2018, Kelvin told Alexander that Kemily "might get what she was asking for," which Alexander perceived to be a threat. According to Alexander, Kemily had been talkative and smiled all the time prior to the marriage but that during the marriage,

---

[2] At a hearing on a motion to modify the temporary order with respect to the award of child custody, an acquaintance of Kemily's, Iris Williams, testified that she had overheard Kelvin yelling at Kemily at a dance recital in May 2018. Williams said Kelvin had aggression in his voice, which caused others to turn around and look.

Kemily often complained of headaches. Alexander testified that she believed it was not in Kemily's best interests to remain married to Kelvin.

¶6. Kelvin acknowledged that he and Kemily had problems throughout their marriage. He also admitted that it had made him "sick" to hear Kemily's sister on the phone, but he testified that he did not want to hinder Kemily's relationship with her family. Kelvin explained that the issue with the homeless man was about security. He denied that he had yelled at Kemily's dog all the time and berated Kemily in front of his church congregation. Kelvin admitted that he bumped into Kemily one time, but he said that it was not intentional. Kelvin also confirmed that he had kicked a suitcase, but he did not recall the suitcase hitting Kemily.

¶7. According to Kelvin, Kemily did not "take any personal accountability" for anything and accepted advice from everyone except him. Kelvin admitted he followed Kemily during arguments, but he referred to his yelling as "pastor intense fellowship" and explained that he was just "naturally loud." He also acknowledged calling Kemily a b**** and a wh*** after her ex-boyfriend had emailed her. Kelvin testified that he had probably said Kemily was being stupid and that they have both criticized each other and called each other dumb. Kelvin believed that reconciliation was in everyone's best interests.

¶8. On December 19, 2018, the chancery court denied Kemily's request for a divorce and attorney's fees, finding that the "evidence presented [was] insufficient to grant [Kemily] a divorce on the ground of habitual cruel and inhuman treatment." Noting there was no evidence of physical abuse, the court concluded that "the parties may be unable to live

4

together in the future; however, this [c]ourt is bound to apply the law." Kemily filed a motion for a new trial, as well as a motion for reconsideration or, in the alternative, to alter or amend the final judgment. The chancellor denied Kemily's motions, and Kemily appeals, asserting that (1) the chancellor should have granted her a divorce on the ground of habitual cruel and inhuman treatment, and (2) the chancellor erred by denying her post-trial motions.

## STANDARD OF REVIEW

¶9. "In domestic-relation cases, our review is limited to whether the chancery court's findings were manifestly wrong or clearly erroneous, or the court applied the wrong legal standard." *Gwathney v. Gwathney*, 208 So. 3d 1087, 1088 (¶5) (Miss. Ct. App. 2017). We will not disturb the chancery court's decision on appeal if there is substantial evidence to support the court's findings of fact. *Id*.

## DISCUSSION

¶10. Because the issues Kemily raises concern the same standard of review and determination of findings of fact, we will address them together. "To obtain a divorce on the grounds of habitual, cruel and inhuman treatment, a petitioner must prove by a preponderance of the evidence, acts which constitute such treatment." *Reed v. Reed*, 839 So. 2d 565, 569 (¶13) (Miss. Ct. App. 2003) (citing *Chamblee v. Chamblee*, 637 So. 2d 850, 859 (Miss. 1994)). In determining whether a divorce on the ground of habitual cruel and inhuman treatment is warranted, the chancery court has a "dual focus"—"the conduct of the offending spouse and its impact on the offended spouse." *Gwathney*, 208 So. 3d at 1089 (¶6) (quoting *Harmon v. Harmon*, 141 So. 3d 37, 42 (¶16) (Miss. Ct. App. 2014)). "This specific

5

inquiry is subjective." *Id.* "As the trier of fact, the chancellor 'evaluates the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony.'" *Littlefield v. Littlefield*, 282 So. 3d 820, 827 (¶19) (Miss. Ct. App. 2019) (quoting *Rawson v. Buta*, 609 So. 2d 426, 431 (Miss. 1992)).

¶11.   "As a general rule the charge of cruel and inhuman treatment must be founded on conduct that is continuous and not based on one isolated incident." *Reed*, 839 So. 2d at 570 (¶21) (citing *Ellzey v. Ellzey*, 253 So. 2d 249, 250 (Miss. 1971)).  In its findings, the chancery court focused on the lack of physical abuse.  However, the Mississippi Supreme Court has held that "habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse." *Holladay v. Holladay*, 776 So. 2d 662, 677 (¶64) (Miss. 2000); *see also Johnson v. Johnson*, 281 So. 3d 70, 75 (¶22) (Miss. Ct. App. 2019) ("Habitual cruel and inhuman treatment may be in the form of emotional abuse when it falls 'along the lines of habitual ill-founded accusations, insults and threats.'") (quoting *Reed*, 839 So. 2d at 570 (¶19)).  We find that sufficient evidence, which if believed, was provided to establish a pattern of emotionally abusive behavior by Kelvin that negatively affected Kemily's health and would support the chancery court's granting of a divorce on the ground of habitual cruel and inhuman treatment.

¶12.   Had Kemily's testimony only been that Kelvin had called her derogatory names, criticized the way she took care of the home, and once kicked a suitcase in a fit of anger toward her, we might agree this would be insufficient to support a finding of habitual cruel

6

and inhuman treatment. However, Kemily also testified that "[i]t was just constant abuse and . . . constant yelling and screaming and berating" and that she "was always on eggshells." Kemily testified that Kelvin picked the lock and barged in on her in the bathroom after she had retreated there for safety. She claimed that when she was pregnant, he pushed her in the hallway after an argument. While these may have been isolated incidents, we find that when they are viewed as a whole, they are sufficient to establish a continuing pattern of behavior constituting more "than mere unkindness, rudeness, or incompatibility to support the granting of a divorce on the ground of cruel and inhuman treatment." *See Jones v. Jones*, 43 So. 3d 465, 469 (¶9) (Miss. Ct. App. 2009) (quoting *Robison v. Robison*, 722 So. 3d 601, 603 (¶5) (Miss. 1998)). As Kemily explained at the hearing:

> [H]is harm to me has always been emotionally, mentally, and spiritually. . . . As he testified, he was an army ranger, he was an instructor and army ranger. That is what he specialized in, in mental abuse. And that is what he did. So, the physical abuse, I probably could have handled that ten times better than the mental abuse that I had to suffer at his hands for those ten years I stayed in the home with him.

In *Bullock v. Bullock*, 699 So. 2d 1205, 1209-10 (¶¶18-20) (Miss. 1997), the supreme court upheld a chancery court's grant of divorce on the ground of habitual and cruel treatment, noting the husband "knew just 'what buttons to push' to make [the wife's] life miserable" and the husband's constant and "incessant degrading and insulting behavior toward [his wife] . . . throughout their eight-year second marriage." *Id.* Subsequently, in *Scally v. Scally*, 802 So. 2d 128, 131-32 (¶¶15, 29) (Miss. Ct. App. 2001), this Court affirmed a chancery court's grant of divorce of the ground of habitual cruel and inhuman treatment, based on the wife's testimony that during the couple's twenty-five year marriage, the husband "was moody,

7

controlling, dominating, and verbally abusive" and said "conduct affected her health, and caused her to fear for her safety."

¶13. Typically, allegations of cruel and inhuman treatment must be corroborated. *Shavers v Shavers*, 982 So. 2d 397, 403 (¶35) (Miss. 2008). "Corroborating evidence need not be sufficient in itself to establish habitual cruelty, but rather need only provide enough supporting facts for a court to conclude the plaintiff's testimony is true." *Smith v. Smith*, 90 So. 3d 1259, 1263 (¶12) (Miss. Ct. App. 2011). However, Mississippi Code Annotated section 93-5-1 (Rev. 2018) was amended in 2017 to provide that "[s]pousal domestic abuse may be established through the reliable testimony of a single credible witness, who may be the injured party." Nevertheless, in the instant case, there was corroborating evidence to support Kemily's testimony.

¶14. Alexander testified that at one occasion, Kemily called her crying, and she heard Kelvin call Kemily "stupid." She also corroborated Kemily's testimony regarding the effect on her health, noting that Kemily "used to be talkative, smiling all the time" but that after she married Kelvin, "she was complaining all of the time about having headaches."

¶15. Kelvin admitted that the couple had troubles prior to 2009 and that he got angry and kicked a suitcase on one occasion. He did not deny yelling at Kemily, but he defined these encounters as "pastor intense fellowship." Kelvin corroborated Kemily's testimony that he followed her into the bathroom when she tried to get away from him, claiming he was trying "to resolve" the conflict. While Kelvin may have thought it was fine for him to pick the lock, corner Kemily in the bathroom (where she hid for safety), and continue to yell at her in an

attempt to "resolve" their argument, it did not make his actions any less upsetting to her. Although he denied ever pushing her, Kelvin did admit to "bumping" Kemily during an argument. Kelvin criticized the way Kemily handled their finances, prompting him to take control over them. He acknowledged that he had criticized how she cleaned the house and even how she cut cornbread. He also said that on one occasion, he called her a "wh***" and a "b****." Kelvin's defense for his behavior was simply to say that Kemily fails to take "personal accountability," in essence, placing the blame on Kemily for his anger. Furthermore, Kevin provided no evidence to dispute that his behavior, regardless of his intent or motive, adversely impacted Kemily.

¶16. We find that Kemily presented sufficient evidence, which if believed, established that Kelvin's behavior negatively affected her overall demeanor and caused her physical harm (e.g., migraines and elevated blood pressure). Accordingly, having determined that the chancery court erred in summarily concluding there was insufficient evidence of habitual cruel and inhuman treatment, we remand to the chancery court for further consideration in accordance with this opinion.[3]

¶17. **REVERSED AND REMANDED.**

**CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. GREENLEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON, P.J.**

**GREENLEE, J., DISSENTING:**

---

[3] Had the chancery court found that Kemily's testimony lacked credibility, we would agree with the dissent and defer to the court's discretion in such matters. But the chancery court's order made no such determination, and we cannot conclude that the court's determination of insufficient evidence is supported by the record.

¶18. Because I would affirm the judgment of the chancery court, I respectfully dissent.

¶19. "In domestic-relation cases, [this Court's] review is limited to whether the chancery court's findings were manifestly wrong or clearly erroneous, or the court applied the wrong legal standard." *Gwathney v. Gwathney*, 208 So. 3d 1087, 1088 (¶5) (Miss. Ct. App. 2017) (quoting *Lomax v. Lomax*, 172 So. 3d 1258, 1260 (¶5) (Miss. Ct. App. 2015)). "If substantial evidence in the record supports the chancellor's findings of fact, [this Court] will not disturb [her] decision." *Id*.

¶20. "Habitual cruel and inhuman treatment is conduct that either: (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to render the marriage revolting to the non-offending spouse, making it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance." *Hoffman v. Hoffman*, 270 So. 3d 1121, 1126 (¶23) (Miss. Ct. App. 2018) (quoting *Farris v. Farris*, 202 So. 3d 223, 231 (¶29) (Miss. Ct. App. 2016)). "To prove habitual cruelty, the plaintiff must show more than mere unkindness, rudeness, or incompatibility." *Id*. (quoting *Smith v. Smith*, 90 So. 3d 1259, 1236 (¶13) (Miss. Ct. App. 2011)). This Court has held that "[a]lthough in cases of violence a single incident may be sufficient for a divorce, generally the plaintiff must show a pattern of conduct." *Id.*

¶21. In divorce cases, the chancellor acts as the trier of fact and "must evaluate the sufficiency of proof based on the credibility of witnesses and the weight of their testimony." *Shavers v. Shavers*, 982 So. 2d 397, 405 (¶41) (Miss. 2008) (citing *Rainey v. Rainey*, 205 So.

2d 514, 515 (Miss. 1967)). "In reviewing a cruelty-based divorce, 'there is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse.'" *Harmon v. Harmon*, 141 So. 3d 37, 42 (¶16) (Miss. Ct. App. 2014) (quoting *Smith*, 90 So. 3d at 1263 (¶11)). A subjective standard rather than an "ordinary, reasonable-person standard" is employed in these cases, and "we concentrate on the conduct's effect on the particular offended spouse." *Id*.

¶22. Kemily asserts that the chancellor erred by not conducting a subjective inquiry into how Kelvin's conduct affected her. But the record shows that the chancellor considered the evidence before her. Simply because the chancellor denied Kemily's request for a divorce does not mean she did not consider how Kelvin's conduct affected Kemily. *See Wangler v. Wangler*, 294 So. 3d 1138, 1147 (¶38) & n.5 (Miss. 2020). Furthermore, while Kemily testified that she suffered from migraines and elevated blood pressure when she lived with Kelvin, she testified that she was diagnosed with migraines in high school and that she was never diagnosed with high blood pressure. Therefore, unlike the majority, I cannot say that Kemily established that Kelvin's behavior negatively affected her overall demeanor and caused her physical harm.

¶23. Kemily also asserts that the chancellor erred by concluding that Kelvin did not physically abuse her. Effective July 1, 2017, the Legislature amended section 93-5-1 to include "spousal domestic abuse" as a form of habitual cruel and inhuman treatment. 2017 Miss. Laws ch. 427, § 6 (S.B. 2680); Miss. Code Ann. § 93-5-1 (Rev. 2018). Because Kemily filed for divorce on the ground of habitual cruel and inhuman treatment after July 1,

11

2017, the amended language of section 93-5-1 applied to her complaint. *See Wangler*, 294 So. 3d at 1141 (¶11).

¶24. Kemily argues that Kelvin physically abused her when he kicked a suitcase and pushed her in the hallway. Although Kelvin admitted that he kicked the suitcase, he did not recall the suitcase hitting Kemily. Additionally, Kelvin said that he did not intentionally bump into Kemily in the hallway. During Kemily's cross-examination, Kelvin's attorney stated, "[O]n Page 5 of your Interrogatory responses . . . it says, ['D]uring our second year of marriage, Kelvin yelled at me and pushed me . . . ["]accidentally["] while following me . . . .'" Kelvin's attorney then asked Kemily, "Is that testimony in your sworn answers to Interrogatories true?" and Kemily responded, "As far as I know."

¶25. Furthermore, Kemily seemingly conceded that Kelvin's conduct did not rise to the level of physical abuse when she testified that Kelvin's harm "has always been emotionally, mentally, and spiritually." Kemily testified, "So, the physical abuse, I probably could have handled that ten times better than the mental abuse that I had to suffer . . . ." In this case, the chancellor cited to the amended version of the statute and found that the evidence was insufficient to grant a divorce on the ground of habitual cruel and inhuman treatment.[4]

¶26. "A marriage may become unpleasant and argumentative, but not rise to the level of being so unnatural and infamous as to warrant the grant of divorce on the ground of habitual

---

[4] This Court "gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior." *Hoffman*, 270 So. 3d at 1127 (¶27) (quoting *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013)). Although the chancery court's opinion does not appear to make direct findings as to witness credibility, the chancery court's opinion reflects that the chancellor considered the testimony presented at trial.

12

cruel and inhuman treatment." *Osborne v. Osborne*, 202 So. 3d 639, 642 (¶16) (Miss. Ct. App. 2016) (citing *Killen v. Killen*, 54 So. 3d 869, 873 (Miss. Ct. App. 2010)). While Kemily and Kelvin may have a difficult marriage, I find no clear error, legal error, or abuse of discretion in the chancery court's findings and conclusions. Therefore, I dissent.

**WILSON, P.J., JOINS THIS OPINION.**