# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01354-COA

**MATTHEW BYRON JOHNSON**                                             **APPELLANT**

**v.**

**LAURA KAY HENRY JOHNSON**                                             **APPELLEE**

DATE OF JUDGMENT:              11/12/2021
TRIAL JUDGE:                   HON. VICKI B. DANIELS
COURT FROM WHICH APPEALED:     DESOTO COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        A. E. (RUSTY) HARLOW JR.
ATTORNEY FOR APPELLEE:         VANESSA WINKLER PRICE
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED IN PART; REVERSED AND
                               REMANDED IN PART - 03/07/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     The DeSoto County Chancery Court granted Laura Johnson a divorce from Matthew (Matt) Johnson on the ground of habitual cruel and inhuman treatment. On appeal from the chancellor's judgment, Matt argues the chancellor erred in granting the divorce and in distributing the marital property. Upon review, we find no error in the chancellor's grant of a divorce based on habitual cruel and inhuman treatment. We therefore affirm that part of the judgment. However, based on a lack of findings in the judgment as to the classification, valuation, and distribution of the parties' property, we reverse the judgment in part on the division of the marital estate and remand the case for further proceedings consistent with this opinion.

**FACTS**

¶2.     The parties wed in 2012 and had two daughters during their marriage. Laura first filed for divorce in 2019. Although she withdrew the complaint after Matt promised to attend counseling with her, she testified that the marriage continued to deteriorate. The parties separated on January 13, 2021, and on January 20, 2021, Laura filed for divorce on the ground of habitual cruel and inhuman treatment.

¶3.     At the hearing on Laura's divorce complaint, she described Matt as an angry person who constantly yelled at her. Laura testified that she "lived on pins and needles most of [their] marriage" and that the last three years of marriage had especially included "a lot of turmoil." In explaining what finally compelled her to file for divorce, Laura testified as follows:

> [I]t's one thing [w]hat you'll put up with when it's yourself. It's another thing what you'll put up with [when] your children [are] involved, and I want a good environment for my children, and this is not a good environment because I would plead and beg him, "Please don't scream at me right now. Can we wait until the kids go to bed? Please don't say the F bomb and G-D in front of these kids. Please don't get upset."
>      Because when he gets upset, he may be trying to talk, but he is banging his hand on the countertop. And even my three-year-old daughter would say, "Calm down, calm down." And then I knew at that point, I had to do something.
>      . . . Even to the fact of when Matt gets mad and his anger, he does not stop. It does not matter who is around, whether the children are around or not, he does not stop.

¶4.     Laura repeatedly described Matt's anger as an ongoing issue throughout their marriage. She admitted that Matt had never physically injured her or their children during his outbursts; however, Laura testified that Matt had occasionally hit the parties' dogs and

that most often his anger had resulted in property damage inflicted on their home. For instance, Laura stated the following during her direct examination:

> [I]f I didn't do what he would say[,] or if I didn't diffuse the situation, he has punched holes in my walls. He has broke[n] glass. He has done this at night with alcohol involved. He has done this sober. He broke the glass. My back door glass shattered. He broke the frame one time, and . . . I just now fixed that myself. I fixed the hole in the wall myself. Th[e] sink is still broken. My shower has a hole in it from him throwing a beer bottle. The cabinet on . . . my jacuzzi tub is broken because the dog tore the lining out of it[,] and [Matt] kicked it so hard that it scratched the wood.

¶5. Laura further testified that Matt would sometimes prevent her from leaving their home when he was upset. Laura recalled one incident when the parties' eldest daughter was about six months old. Laura testified that Matt had arrived at her parents' house and had begun to yell and curse before slamming the door as he exited the house. Laura left the parties' daughter at her parents' home and returned to her own residence to speak with Matt. According to Laura, Matt "held [her] there in the kitchen talking to him, yelling and screaming at [her], and he stood in the doorway[ and] would not let [her] out . . . ." Laura stated that Matt continued to prevent her from leaving the house even after she reminded him that she needed to pick up and feed their infant daughter, who was still nursing. Although Matt told Laura their daughter would be fine, Laura testified that their daughter was not fine because she was very hungry by the time Laura returned to her parents' home.

¶6. On another occasion, Matt called Laura on his way home and was angry. Laura testified that she "just had a gut feeling" that she needed to leave their home, so she and the parties' eldest daughter spent the night at her parents' house. At other times during the marriage, Laura stated that Matt would confront her at home and "would stand in front of

3

[her] and wouldn't let [her] . . . out of the situation . . . [for] hours." She further stated that during those incidences, Matt "would stand over [her] and the girls [for] hours, yelling, and he would bang his hands . . . ." Laura also estimated that on at least twenty separate occasions, Matt had accused her of cheating on him without any proof. At other times, she testified that Matt became so angry he would threaten to kill himself.

¶7. Laura finally purchased a tape recorder to document Matt's outbursts. At trial, Laura's attorney played portions of the recordings. Although the recordings were not admitted into evidence as exhibits, Laura provided testimony about each excerpt played during the hearing. One such excerpt involved a conversation between Matt and Laura in January 2021 before Laura filed the divorce complaint. Laura testified that the exchange occurred at their home and that the parties' two daughters were present. Laura stated that during the recorded conversation, Matt had kicked in a baby gate and then hit the wall. With regard to another excerpt, Laura testified that Matt became angry and started banging his hand on the counter. In addition to recording Matt, Laura stated that after she filed for divorce she put a tracking device on his vehicle. Laura explained that she did not use the tracking device to follow Matt. Instead, she used the device to prevent Matt from trapping her at the marital home without an escape and forcing her to speak to him.

¶8. Laura also testified about the physical, mental, and emotional toll that Matt's behavior had taken on her. According to Laura, Matt would often belittle her and disregard her opinion. She stated that she would be on "pins and needles" around Matt "because [she] never knew how he was going to come at [her]." Laura further stated that she had

4

experienced tension in her jaws and neck and that her doctor had prescribed anti-anxiety medicine because she had become "so sad, very isolated, [and] very depressed."

¶9.    Following Laura's testimony, her attorney called Matt as an adverse witness. Matt admitted that multiple times he had not allowed Laura to leave their home until they had fully discussed whatever matter was on his mind. He further admitted that it was his voice on Laura's audio recordings and that he had said "the F word at least three or four times every minute" in front of his daughters during one recording. As also captured on the audio recordings, he had not only threatened to kill himself but also had said he might "go outside and kill six other people, too." When asked about the multiple times he had threatened to kill himself, Matt claimed that he was "just running [his] mouth." Matt also admitted that on multiple occasions, he had accused Laura of cheating, and he did not deny that on one recording he had called Laura a "whore." Matt stated that he had no proof to substantiate his claims that Laura had cheated on him. He also admitted that calling Laura a "whore" and cursing was not an appropriate way to speak in front of his daughters. When asked whether he thought Laura should have to live with such behavior on a daily basis, Matt replied, "No, . . . I do not."

¶10.   Laura's mother Joann Henry also testified at the hearing. Joann stated that the parties' relationship had begun to deteriorate after about two or three years of marriage and that Laura had "become afraid of Matt throughout the years." Joann observed that over the course of the parties' marriage, Matt had stopped participating in activities with Laura and Laura no longer had as much freedom in her life, had grown lonely, and had become isolated

5

from her friends. According to Joann, the parties often fought, and after the fights occurred, Laura would arrive at her parents' house in tears, shaking, and so upset that she could not speak. Although Joann did not observe any significant physical changes in her daughter, she testified that the "mental abuse was ever present" in the marriage. Joann also corroborated that Matt often inflicted physical damage to the parties' home during his outbursts.

¶11. After considering the parties' testimony and evidence, the chancellor entered a judgment granting Laura a divorce on the ground of habitual cruel and inhuman treatment. The chancellor awarded the parties joint legal custody, granted Laura sole physical custody, and granted Matt visitation. The chancellor also awarded Laura the marital residence and ordered Matt to pay Laura $800 a month in child support. Matt filed a motion for reconsideration, which the chancellor partially granted by modifying the visitation schedule to include summer visitation. The chancellor denied all other requested relief. Aggrieved by the chancellor's judgment, Matt appeals.

**STANDARD OF REVIEW**

¶12. This Court applies a limited standard of review to domestic-relations matters. *Kelley v. Zitzelberger*, 342 So. 3d 499, 503 (¶10) (Miss. Ct. App. 2022). We "will not disturb the factual findings of a chancellor when supported by substantial evidence unless the chancellor abused [her] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Schmidt v. Schmidt*, 339 So. 3d 163, 174 (¶30) (Miss. Ct. App. 2022) (quoting *Campbell v. Watts*, 192 So. 3d 317, 318 (¶5) (Miss. Ct. App. 2015)). We review questions of law de novo. *Id.*

6

## DISCUSSION

### I. Habitual Cruel and Inhuman Treatment

¶13. Matt contends that Laura presented insufficient evidence to prove habitual cruel and inhuman treatment. He therefore asserts that the chancellor erred by granting a divorce based on that ground.

¶14. To prove habitual cruel and inhuman treatment, a party must establish by a preponderance of the evidence conduct that either

>    (1)    endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or

>    (2)    is so unnatural and infamous as to make the marriage revolting to the nonoffending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Harmon v. Harmon*, 141 So. 3d 37, 41 (¶14) (Miss. Ct. App. 2014) (quoting *Smith v. Smith*, 90 So. 3d 1259, 1262 (¶10) (Miss. Ct. App. 2011)).

¶15. "Generally, habitually cruel conduct must be routine and continuous. However, a pattern is not always required. Sometimes, a single act of physical violence is sufficient." *Id.* at (¶15) (citations and internal quotation mark omitted). "[W]here there is no physical violence, we consider the frequency and severity of the conduct, and the impact on the offended spouse." *Id.* Although "[v]erbal abuse, neglect, and the like, considered independently, will not amount to cruelty[,]" when combined, if these acts "manifest a course of revolting conduct, they may give rise to cruelty." *Id.* at 41-42 (¶15) (citation and internal quotation mark omitted). "Habitual cruel and inhuman treatment may be in the form of

7

emotional abuse when it falls 'along the lines of habitual ill-founded accusations, insults and threats.'" *Johnson v. Johnson*, 281 So. 3d 70, 75 (¶22) (Miss. Ct. App. 2019) (quoting *Reed v. Reed*, 839 So. 2d 565, 570 (¶19) (Miss. Ct. App. 2003)). But the offending spouse's "conduct must exceed unkindness or rudeness or mere incompatibility or want of affection . . . ." *Roley v. Roley*, 329 So. 3d 473, 492 (¶51) (Miss. Ct. App. 2021) (quoting *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶15) (Miss. Ct. App. 2020)).

¶16. To determine whether the standard for habitual cruel and inhuman treatment has been met, the chancellor "must employ 'a dual focus on the conduct of the defendant and the impact of that conduct on the plaintiff . . . .'" *Id.* (quoting *Smith*, 90 So. 3d at 1263 (¶11)). As we explained in *Roley*,

> [t]his is a subjective inquiry with the focus on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person. The plaintiff must show a ca[us]al connection between the defendant's conduct and the impact on the plaintiff, but the law no longer requires a strict causal connection between the defendant's conduct and the separation.

*Id.* (citations and internal quotation marks omitted). The "party alleging cruelty must generally corroborate his or her testimony, [but] an exception is made 'where corroboration is not reasonably possible because of the nature of the accusation.'" *Harmon*, 141 So. 3d at 42 (¶16) (quoting *Smith*, 90 So. 3d at 1263 (¶12)).[1] "Additionally, 'the corroborating

---

[1] As we have previously recognized,

In 2017, the Mississippi Legislature amended section 93-5-1 to provide for divorce based on "habitual cruel and inhuman treatment, *including spousal domestic abuse.*" Miss. Code Ann. § 93-5-1. The revised statute allows for corroboration in cases involving spousal domestic abuse by "the reliable testimony of a single credible witness, *who may be the injured party* . . . ." [*Id.*]

evidence need not be sufficient in itself to establish the ground,' but rather 'need only provide enough supporting facts for a court to conclude that the plaintiff's testimony is true.'" *Jones v. Jones*, 43 So. 3d 465, 478 (¶30) (Miss. Ct. App. 2009) (quoting Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8][d], at 74 (2d ed. 2005)). "As the trier of fact, the chancellor 'evaluates the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony.'" *Roley*, 329 So. 3d at 492-93 (¶53) (quoting *Littlefield v. Littlefield*, 282 So. 3d 820, 827 (¶19) (Miss. Ct. App. 2019)).

¶17.    Here, Laura and her mother both testified about Matt's ongoing behavior throughout the parties' marriage and its impact on Laura. Laura provided testimony and audio proof of Matt's outbursts, the physical damage he had inflicted upon their home, the abusive language he had used toward her, and the resulting physical and emotional effects she had experienced. Matt himself admitted that the episodes had occurred and that some had even taken place in front of the parties' daughters. Matt also confirmed that he had repeatedly accused Laura of infidelity without any proof, had called Laura a "whore" and cursed in front of the parties' daughters, and had prevented Laura from freely leaving the marital home on multiple occasions. In addition, Laura's mother corroborated that Matt often had angry outbursts that resulted in damage to the marital home, and she testified that over time, Laura grew isolated and depressed due to the "mental abuse" present in the parties' marriage. Upon review, we find that Laura presented sufficient evidence from which the chancellor could conclude Matt's behavior constituted habitual cruel and inhuman treatment. We therefore find no error

---

*Roley*, 329 So. 3d at 492 (¶52) (footnote omitted).

in the chancellor's grant of a divorce to Laura based on that ground.

## II.    Property Division

¶18.    Matt also argues that the chancellor failed to make sufficient findings of fact regarding the distribution of the marital estate under the factors established in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).[2]  Upon review, we agree.  As our caselaw explains,

> [t]o equitably divide property, the chancellor must: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) equitably divide the marital assets based upon the *Ferguson* factors.  Although the chancellor need not evaluate every *Ferguson* factor, the chancellor must consider the factors relevant to the case, on the record, in every case.  The policy consideration behind this requirement is not only essential for appellate purposes, but to provide trial courts a checklist to assist in the accuracy of their rulings and to reduce unintended errors that may affect the court's ultimate decision.  The absence of an analysis of these factors and failure to apply the law to the facts at hand create error.

---

[2] The *Ferguson* factors include the following:

(1)    contribution to the accumulation of property;

(2)    dissipation of assets;

(3)    the market or emotional value of the assets subject to distribution;

(4)    the value of assets not subject to distribution;

(5)    the tax and economic consequences of the distribution;

(6)    the extent to which property division may eliminate the need for alimony;

(7)    the financial security needs of the parties; and

(8)    any other factor that in equity should be considered.

*Ferguson*, 639 So. 2d at 928.

*Speights v. Speights*, 270 So. 3d 968, 975 (¶27) (Miss. Ct. App. 2018) (citations and internal quotation marks omitted).

¶19. Here, the chancellor addressed the issue of property division by simply stating that each party would receive "sole possession" of his or her own "personal items" and by then assigning each party certain assets and debts that the chancellor designated as marital property. The chancellor neither provided an explanation or analysis for her classification of the parties' property nor stated a valuation for any property items. In addition, the chancellor did not reference any evidence from the hearing that would support her determinations regarding classification and valuation. Moreover, although the chancellor set forth the *Ferguson* factors, she did not provide an explanation or analysis regarding any of the factors she considered relevant. Based on the judgment's lack of findings to support the chancellor's decision, we reverse the judgment in part on the division of the marital estate and remand the case to allow the chancellor to make appropriate findings of fact and conclusions of law regarding the classification, valuation, and distribution of the parties' property.

**CONCLUSION**

¶20. We affirm the chancellor's grant of a divorce to Laura on the ground of habitual cruel and inhuman treatment. However, due to a lack of factual findings by the chancellor to support the division of the parties' property, we reverse that portion of the judgment and remand for further proceedings consistent with this opinion.

¶21. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**