# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00088-COA

**RALPH FRANKS**                                              **APPELLANT**

**v.**

**WENDY FRANKS**                                              **APPELLEE**

DATE OF JUDGMENT:              09/22/2022
TRIAL JUDGE:                   HON. SHEILA HAVARD SMALLWOOD
COURT FROM WHICH APPEALED:     MARION COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        TODD BRENTLEY OTT
ATTORNEY FOR APPELLEE:         BECKY JO HOLLEN WILLIAMS
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED - 09/17/2024
MOTION FOR REHEARING FILED:

### BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     Ralph Franks appeals from a final judgment of divorce. He argues that the chancellor erred in (1) requiring him to sell the marital home, (2) finding that he dissipated marital assets, (3) calculating the marital estate, (4) awarding attorney's fees to Wendy Franks, (5) not crediting him for payments made toward the marital home after the demarcation date, and (6) calculating child support and determining Wendy's income. Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     Wendy and Ralph were married in March 2008 and separated in January 2020. They have one child, C.F., who was born in January 2007. On January 24, 2020, Wendy filed a complaint for divorce in the Marion County Chancery Court, alleging that she was entitled to a divorce based on fault grounds and, alternatively, irreconcilable differences. Ralph filed

an answer and counterclaim, also alleging he was entitled to a divorce based on fault grounds and, alternatively, irreconcilable differences. Both Wendy and Ralph sought custody of C.F. and an equitable distribution of the marital assets and debts. On March 23, 2020, the chancery court entered a temporary order granting Ralph physical custody of C.F., the parties joint legal custody, and Wendy visitation. The temporary order also gave Ralph use and possession of the marital home and required Ralph to pay Wendy $5,000 to establish living arrangements outside the marital home.

¶3. On July 23, 2020, the chancery court entered an "Order on Motions," setting a summer visitation schedule for Wendy and ordering her to pay $190 per month in child support. In December 2020, the chancery court entered an order appointing a guardian ad litem to investigate allegations the parties had made and to recommend which parent should have custody.

¶4. On July 22, 2021, after a pretrial hearing, the chancellor signed an order titled "Order Compelling Opportunity to Purchase Home." The order, which was entered on July 23, 2021, stated that "Wendy Franks shall have the opportunity to purchase the marital home and the adjoining 5 acres more specifically detailed on the Appraisal presented to the Court at the hearing hereon for the appraised price of $275,500.00." The order directed the parties to make the property available for inspection on July 23 by an appraiser chosen by Wendy.

¶5. On August 13, 2021, the court entered an order regarding the purchase of the marital home. The order stated that the parties had agreed to proceed on irreconcilable differences and agreed to joint legal custody of C.F. Regarding the home, the order directed: "Wendy

2

shall close o[n] the purchase of the marital home or [sic] before August 28, 2021, by which time Ralph shall vacate the premises. Additionally, Ralph shall execute any and all documents necessary to facilitate Wendy's purchase of the marital home."

¶6. On August 25, 2021, Ralph moved to clarify the terms of the August 13 order, for more time to vacate the marital home, for funds from the sale proceeds, and for contempt. Ralph admitted that he "agreed during a pretrial conference in July of 2021 to sell to the Plaintiff the marital home and the five acres for $ 275,000.00," which was the appraisal price that Ralph "obtained from Fred Bruher." However, after learning that the bank's current appraisal and the original appraisal of the house when it was purchased was approximately $320,000, Ralph deemed his appraisal "suspect to say the least." Ralph also asserted that there was confusion as to whether Wendy was to purchase the home and five acres or "the entire tract of property," including the ten acres adjoining the home and the five acres. Ralph contended that "[t]he ten acres is a rectangular shape tract [that] would be impossible to sell separately," and "[t]he second order was to include all the property not just the house and 5 acres." Thus, Ralph argued that Wendy "should be required to purchase the entire tract of property." Ralph also argued that because he was "not receiving any funds from the purchase" of the home, it was "impossible for him to locate another home . . . ."

¶7. On February 22, 2022, Ralph filed a motion requesting that the chancellor use the date of the temporary order as the date of demarcation. On March 11, 2022, the chancery court entered an order declaring the line of demarcation as March 23, 2020, the date of the temporary order. At the hearing on the matter, Wendy advised that she was obtaining an

3

appraisal on the ten acres adjacent to the marital home.

¶8.     On March 31, 2022, the parties filed their consent to withdraw their fault grounds for divorce and proceed on a claim of irreconcilable differences.  They stipulated the following issues to be resolved by the chancellor: child custody, child support, and visitation; school, extracurricular activities, and health insurance for the child; the equitable distribution of the marital estate and debts, including the determination of the marital property and its fair market value; contempt allegations by both parties; and the payment of attorney's fees and costs.

¶9.     On September 22, 2022, the chancery court entered its opinion and final judgment granting the parties a divorce based on irreconcilable differences.  Based in part on the guardian ad litem's recommendation, the parties agreed to share joint legal and physical custody, rotating on a "2/2/3 schedule."  The chancery court also set holiday and summer custodial periods, which the parties were free to alter by agreement if necessary.  Ralph was ordered to pay Wendy $407 per month in child support based on the disparity in the parties' incomes.  Ralph was ordered to provide health, vision, and dental insurance for C.F.  The parties were ordered to split the costs of C.F.'s extracurricular activities and alternate tax years.

¶10.    With regard to the marital assets and debts, the chancellor considered Ralph's higher income, Wendy's need for financial security, and Ralph's affair with his former secretary (during which time the secretary had embezzled $150,000 worth of marital assets).  The chancellor found that "with emphasis on Ralph's dissipation of marital assets and Wendy's

4

need for financial security," Wendy should be awarded a greater share of the marital assets. Wendy was awarded $73,651.97, and Ralph was awarded $63,519.26. Ralph was given the debt in his name, which totaled $359,684, and Wendy was given the debt in her name, which totaled $311,789. The chancellor found that Wendy was unable to pay her attorney's fees and ordered Ralph to pay her lawyer $15,000 using marital funds held in the registry of the court.

¶11. Wendy filed a motion for reconsideration or, alternatively, to amend or correct the judgment. Ralph filed a motion to alter or amend the judgment and for a stay. The motions were denied.

¶12. Ralph appeals raising the following issues: (1) the chancery court erred in requiring Ralph to sell the marital home; (2) the chancery court applied an erroneous legal standard in finding that Ralph dissipated marital assets; (3) the chancery court erred in its calculation of the marital estate; (4) the chancery court erred in finding that Wendy could not pay her own attorney's fees; (5) the chancery court failed to give him credit for payments made toward the marital home after the demarcation date; and (6) the chancery court erred in its calculation of child support and determination of Wendy's income. We find no error and affirm.

**STANDARD OF REVIEW**

¶13. This Court will not disturb a chancellor's findings unless the chancellor's decision was manifestly wrong or clearly erroneous or unless the chancellor applied an incorrect legal standard. *Lockhart v. Lockhart*, 324 So. 3d 777, 788 (¶37) (Miss. 2021). "[C]hancellors are

afforded wide latitude in fashioning equitable remedies in domestic relations matters . . . ." *Id.* A chancellor's findings of fact will not be reversed if supported by substantial credible evidence in the record. *Id.* Questions of law are reviewed de novo. *Id.* at (¶38).

**DISCUSSION**

### I. Sale of the Marital Home to Wendy

¶14. Ralph argues that the chancellor erred in "prematurely dividing the marital home" and "forc[ing]" him to sell the marital home to Wendy before the divorce was final. On July 23, 2021, the chancellor entered an order titled "Order Compelling Opportunity to Purchase Home," which required Ralph to give Wendy "the opportunity to purchase the marital home and the adjoining 5 acres more specifically detailed on the Appraisal presented to the Court at the hearing hereon for the appraised price of $275,500.00." On August 13, 2021, the chancellor entered an order requiring that Wendy close on the purchase of the home by August 28, 2021, and directing Ralph to vacate the home by that date. Wendy obtained financing and purchased the home from Ralph. The final judgment of divorce was entered approximately fourteen months later, on September 22, 2022.

¶15. Ralph argues that the chancellor acted without legal justification in ordering the "forced sale" of the marital home prior to the judgment of divorce. Despite Ralph's characterization of the sale as "forced," it is undisputed that Ralph voluntarily offered to sell the marital home to Wendy for the price determined by his appraiser during a hearing before the chancellor.[1] The chancellor's order simply memorialized Ralph's offer.

---

[1] The court reporter could not find the transcript of the hearing; therefore, it is not part of the record. However, it is undisputed that Ralph offered to sell Wendy the home during

¶16.    Although Ralph concedes that he offered to sell the home to Wendy during the hearing, he argues that the offer was unenforceable and the sale price was unfair. Specifically, Ralph argues that (1) the offer was unenforceable because it does not comply with the statute of frauds, (2) the offer was unsupported by the record, (3) he did not waive his objection to sell the home, and (4) the chancellor abused her discretion in setting the sale price at $275,500.

### 1.    Statute of Frauds

¶17.    The "statute of frauds provides that no contract for the conveyance of an interest in land is binding unless signed by the party to be charged." *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 206 (Miss. 1984) (citing Miss. Code Ann. § 15-3-1(c)).  The statute of frauds states that "[a]n action shall not be brought whereby to charge a defendant . . . upon any contract for the sale of lands . . . unless . . . the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing."  Miss. Code Ann. § 15-3-1(c) (Rev. 2019).

¶18.    Ralph argues that "[i]t is undisputed . . . there was no written agreement for the sale-purchase of the home.  As contracts for the sale of lands must be in writing, any oral agreement to sell or purchase such real property is legally unenforceable, pursuant to the Statute of Frauds."

¶19.    In *Wray v. Langston*, 380 So. 2d 1262, 1263 (Miss. 1980), Hilda Langston was

the hearing.

7

granted a divorce from Olyn Lee Wray. The final judgment of divorce stated that at the divorce trial, the parties, through their attorneys, orally announced that certain matters had been settled by the parties, including property rights. The chancellor found the parties' "agreement should be approved and ratified by the Court and made a part of [the divorce] decree." *Id.* at 1263. Memorializing the parties' agreement regarding the marital home, the final judgment of divorce ordered Wray "to execute a quit claim deed to any right, title, and interest he may have in either the home or the furnishings therein, as agreed by the parties, with [Langston] assuming all outstanding liabilities against said home." *Id.* Wray later moved to set aside the decree, arguing that the chancellor had no authority to order the conveyance of the home. *Id.* The Supreme Court found that the chancellor's order "did not, of itself, divest title from appellant, but simply set out and followed the agreement of the parties, which was incorporated into the decree, and subsequently was performed by appellant." *Id.* The Supreme Court further found "no merit in the argument that the oral agreement violated the Statute of Frauds." *Id.* The agreement was "was an enforceable provision of the decree." *Parker v. Parker*, 434 So. 2d 1361, 1362 (Miss. 1983) (citing *Wray*, 380 So. 2d at 1262).

¶20. The agreed sale was reduced to writing in the chancellor's orders. We find no merit to the argument that the agreement violated the statute of frauds. The chancellor's written orders memorialized the agreement, and Ralph performed the agreement by executing the necessary documents to sell the home to Wendy. This issue is without merit.

**2.      Support in the Record for the Offer**

8

¶21. Ralph argues that proof of his oral offer to sell the home to Wendy is not supported by the record. While the court reporter could not find the transcript of the hearing at which Ralph made the offer, the offer and the conditions of the offer are detailed in the record and undisputed by Ralph. After the chancellor entered the July 23, 2021 order compelling the sale of the home based on Ralph's oral offer and Wendy's acceptance, Ralph filed a motion on August 25, 2021, "to clarify the terms of the Order requiring sale of marital home and property, more time to vacate the marital home and for funds from the purchase of the home . . . ." The first substantive paragraph of Ralph's motion begins: "The Defendant agreed during a pretrial conference in July of 2021 to sell to the Plaintiff the marital home and the five acres for $ 275,000.00. The appraisal he obtained from Fred Bruher stated the value was $275,000.00."[2]

¶22. While Ralph later objected to the sale of the home for the agreed upon price, nowhere in the motion for clarification of the order compelling the sale of the home, or anywhere else in the record, does Ralph dispute that he offered to sell the marital home to Wendy for the price set by his appraiser. Rather, Ralph only disputed the circumstances of the offer and sought to withdraw the offer when he learned of the higher appraisals. This issue is without merit.

### 3.    Waiver of Objection to Sell the Marital Home

¶23. On March 31, 2022, the parties filed a stipulation of issues for the chancellor to decide. The stipulation of issues did not reference the marital home. Ralph argues that "the

---

[2] Bruher's report stated that the property had a value of $275,500. The amount is sometimes inconsistently referred to by the parties and chancellor as $275,000.

fact that the forced-sale of the home was not listed in the Stipulation of Issues to be decided by the court, as suggested in the final judgment, does not constitute a ratification of the sale, or a waiver of objection to it." He asserts that there was no point in including the sale of the home on the issues to be decided by the chancellor because the sale had been completed, and there was no longer an issue to be tried.

¶24. While the chancellor noted that the issues regarding the sale of the marital home "were not set forth in the Consent Agreement," the chancellor chose to address the issues "for clarity." Because the chancellor addressed Ralph's argument even though it was not in the stipulation of issues, this issue is without merit.

### 4. Sale Price of the Marital Home

¶25. Ralph argues the chancellor abused her discretion in setting the sale price of the marital home at $275,500 when the home appraised a week after the hearing for $320,000. Ralph argues the parties should be restored to the same positions as before the sale or, alternatively, that he should be awarded the $45,000 difference between the sale price and the bank's appraised price.

¶26. It is undisputed that Ralph chose the appraiser who valued the marital home at $275,500 and that Ralph presented the appraiser's report at a pretrial hearing and offered to sell Wendy the home for that price. In his motion to clarify the order compelling the sale of the home, Ralph argued that even though he had obtained the appraisal and presented it to the court, he later deemed the appraisal "suspect" because other appraisals obtained by the parties valued the property at $320,000. He therefore sought to renege on his offer to sell the

10

property for $275,500. He stated in his motion:

> The Defendant agreed during a pretrial conference in July of 2021 to sell to the Plaintiff the marital home and the five acres for $275,000.00. The appraisal he obtained from Fred Bruher stated the value was $275,000.00. However, the bank's appraiser Patricia Cooper valued the property at $325,000.00. After receipt of Ms. Cooper's appraisal, Mr. Franks located the appraisal originally done on the property by Mr. Beard when it was purchased. It appraised for $325,000.00 (exhibit #1). Clearly the appraisal by Mr. Bruher of $275,000.00 is suspect to say the least.

¶27. The chancery court's opinion and final judgment addressed this issue as follows:

> There was testimony and proof that the true value of the marital home was $320,000 not the $275,500 amount that Wendy relied on to refinance the home. Chancellors have the discretion to average out appraisals when valuing property, but here, Ralph stated with prior counsel that the home was worth $275,500 based on the appraisal of his own expert, Fred Buhrer. He then gave Wendy a chance to purchase the home for that amount and the Court approved the purchase of the home for the appraised value presented. When the bank's appraisal came in at $320,000, Ralph now seeks a credit for the difference. In any event, once Ralph stated she could purchase the home for the $275,000, the Court declines to give credit for the difference of the two appraisals.

¶28. "A chancery court's findings on valuation may be accomplished by adopting the values cited in the parties' [Uniform Chancery Court Rule] 8.05 financial disclosures, in the testimony, or in other evidence." *Case v. Case*, 339 So. 3d 796, 812 (¶58) (Miss. Ct. App. 2022) (quoting *Marter v. Marter*, 95 So. 3d 733, 739 (¶20) (Miss. Ct. App. 2012)). It was within the chancellor's discretion to use the appraisal presented by Ralph as the value of the marital home. *Id.* at 812 (¶61). We find no merit to Ralph's argument that the appraisal he provided was suspect. "One may not complain on review of errors for which he was responsible," nor may an appellant "be permitted to take advantage of errors for the commission of which he was responsible, or which he himself committed, caused, brought

about, provoked, participated in, created, or helped to create, or contributed to." *DeMyers v. DeMyers*, 742 So. 2d 1157, 1160 (¶7) (Miss. 1999) (finding that the appellant could not complain that the trial court erred in considering a document that the appellant introduced as evidence). This issue is without merit.

## II. Dissipation of Marital Assets

¶29. Ralph argues that the chancellor "committed an error of law in charging [him] with dissipation of the marital estate due to embezzlement by his former secretary, which requires reversal."

¶30. Ralph testified that while he and Wendy were married, he and a business partner owned a company called Complete Land & Timber. Around January 2018, during Ralph and Wendy's marriage, Complete Land & Timber hired a secretary who worked for the company for eighteen months. Ralph testified that approximately a year after she started working for the company, he and the secretary began a sexual relationship. Ralph testified that after the affair ended, the secretary was out sick, and he "just decided to go check the checking account, see if she had—just by happenstance to see if she paid herself, you know, during her time she was sick, and then that's when [he] spotted something that was unusual." He asked the company's accountant to review the account, and the embezzlement was discovered. Ralph and his business partner pressed charges, and the secretary entered a guilty plea and agreed to pay restitution.

¶31. Ralph testified that the embezzlement by the company's secretary began "from day one," even before their affair started, with her writing herself extra payroll checks. Ralph

12

estimated that the first year she worked for the company, she embezzled approximately $58,000, and he estimated that she embezzled the remaining $92,000 over the last six months of her employment, when the two were engaged in the affair. Ralph testified that he did not receive any of the embezzled money, there was no plan that he would ever receive any of the money, and the secretary did not give him gifts.

¶32. During the time that the secretary embezzled the $150,000 from Complete Land & Timber, the tax returns reflected that Ralph and his business partner were making $60,000 each, or $120,000 total, from the company. Ralph had no explanation when asked how no one noticed that such a significant amount of money, more than his income from the company, was missing.

¶33. Ralph asserts that he did not dissipate the $150,000, which the chancellor found would have otherwise been a marital asset; rather, it was stolen by an employee, who was criminally prosecuted for the crime. Ralph argues that his affair with the employee "does nothing to convert the theft into an expenditure or transaction by [him]."

¶34. In asserting that the chancellor applied an incorrect legal standard, Ralph cites the definition of dissipation used by this Court in *Smith v. Smith*, 90 So. 3d 1259, 1268 (¶37) (Miss. Ct. App. 2011), which states that "dissipate" means "[t]o spend or expend intemperately or wastefully; squander." (Quoting *Dissipate*, The American Heritage Dictionary 539 (3d ed. 1992)). Dissipation must be "wasteful." *Id.* In *Smith*, this Court also considered the following factors in determining whether a wasteful dissipation has occurred:

(1) whether the expenditure benefit[t]ed the marriage or was made for a purpose entirely unrelated to the marriage;

13

(2)     the timing of the transaction;

(3)     whether the expenditure was excessive or de minimis; and

(4)     whether the dissipating party intended to hide, deplete, or divert the marital assets.

*Id.* at 1268-69 (¶37) (quoting *Thompson v. Thompson*, 811 N.E.2d 888, 915 (Ind. Ct. App. 2004)).  Once the chancellor determines that a wasteful dissipation has occurred, "the court should next consider what amount should be reimbursed to the marital estate (or offset from the dissipating spouse's share of the marital estate)." *Id.* at 1269 (¶39).

¶35.    Although Ralph takes issue with the chancellor's finding that a dissipation occurred, nothing indicates that the chancellor "charg[ed]" him with the stolen money as Ralph claims. The chancellor did not assess the stolen $150,000 against Ralph in the division of assets, nor was Ralph ordered to repay the money.

¶36.    The chancellor's judgment states: "The undisputed testimony proved that Ralph's former secretary embezzled over $150,000 from his business during a time that they were also involved in a sexual relationship. . . .  Ralph's affair led to the dissipation of $150,000 worth of marital assets under the *Smith* analysis."  The chancellor made this statement in the analysis of the equitable division of the property under the *Ferguson* factors, specifically the second factor, which states that when equitably dividing the marital property, the chancery court should consider "[t]he degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise."  *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

¶37.    However, the chancellor did not charge Ralph with the $150,000, as Ralph claims.

14

Rather, the chancellor made clear that she placed blame on Ralph for the dissipation because had he not been involved in the affair, he may have been more diligent and noticed that a significant amount of money was being depleted from the company's account. At the hearing on Ralph's motion to alter or amend the judgment, the chancellor explained that although she found the embezzlement a relevant factor in the property division, she did not assess the embezzled funds against Ralph in the division of the assets. The chancellor stated:

> The testimony was clear and undisputed that Ralph had a former secretary that embezzled $150,000 from the business. He also admitted at that time that he had a sexual relationship with the person who stole this money, and those two factors caused this marital estate to diminish in value, and it was noteworthy. Now, I didn't penalize Ralph $150,000 from his portion of the marital assets in my judgment, but I do think that that factor was relevant, and I did indicate that his . . . perhaps that his judgment was diminished by his relationship with another woman that caused him not to notice a significant amount of money being gone. So I do think that was relevant to the division of assets, and I indicated that in my judgment.

¶38. The chancellor did not penalize Ralph in the division of assets and did not abuse her discretion in finding the embezzlement was relevant in her analysis of the *Ferguson* factors.

### III. Calculation of the Marital Estate

#### 1. Wendy's Business Debt

¶39. Ralph argues that the chancellor erred in deducting Wendy's business debt twice, which improperly reduced the value of her business and the value of the property awarded to her.

¶40. Wendy's businesses and the real property on which the businesses are located were found to be marital assets subject to division and were awarded to Wendy. Wendy owed $212,573 on a business loan. The loan was partially secured by the ten-acre tract adjoining

15

the marital home, which was awarded to Wendy in the equitable distribution of property, and a rental property, which was divided equally between the parties. The ten acres was subject to a $33,600 collateral lien, and the rental property was subject to a $20,000 collateral lien.

¶41.    The chancellor found that Wendy's businesses had no equity when taking into account the $212,573 business loan. Thus, while Wendy was awarded the businesses, $0 in equity was reflected for this asset on the division of assets. The chancellor found that the rental property was valued at $107,500. The chancellor subtracted the $28,500 mortgage owed on the property, as well as the $20,000 collateral lien, leaving equity of $59,000, which was divided equally between the parties. Finally, the ten acres was valued at $44,690. The $33,600 collateral lien was subtracted from this amount, leaving $11,090 in equity.

¶42.    In his posttrial motion, Ralph raised the argument that Wendy's portion of the marital assets was actually $43,600[3] greater than the amount listed on the chancellor's total award to Wendy due to the subtraction of both the business loans and the liens. Concerning this issue, the chancellor stated the following at the hearing on the parties' posttrial motions:

> The allegation that the ten acres and the rental home, that I allowed some double-dipping of that debt. Basically what I did is put what the equity is in the ten acres and in the rental property, and I did discount it for any liens that were in place, and so I did that on all of the marital property, not just the marital property that was given to Wendy in my judgment. The reason that I didn't reflect that more clearly on Wendy's debt on her business is that the majority of her business was premarital and giving her credit for that premarital portion of her business and the debt that was associated with that business occurred after the marriage. Then, you know, there was no equity in that business to divide, and so I feel like the value I placed on it was correct.

_____

[3] The total derived from $33,600 for the collateral lien on ten acres plus half of the $20,000 collateral lien on the rental property.

16

In a footnote in the final judgment, the chancellor noted that "Wendy owned 2/3 of the real property where the businesses sit before the marriage. During the marriage, Wendy's parents deeded her (individually) the remaining 1/3 of the real property."

¶43. "[C]hancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters . . . ." *Lockhart*, 324 So. 3d at 788 (¶37). The chancellor carefully considered the value of Wendy's businesses and associated liabilities, as well as Wendy's nonmarital ownership of the property on which the businesses were located and determined the division of assets was equitable. We cannot find that the chancellor erred. Further, even if Ralph were correct in his argument that the chancellor's calculation of the liabilities associated with Wendy's businesses gave Wendy a greater share of the marital property, our Supreme Court has clearly established that "[a]n equitable division of property does not necessarily mean an equal division of property." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009) (quoting *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994)). "[F]airness is the prevailing guideline in marital division." *Id.* (quoting *Ferguson*, 639 So. 2d at 929). As stated, under the chancellor's analysis of the *Ferguson* factors, the chancellor found that Wendy was entitled to a greater share of the marital assets, and we cannot say there was reversible error in the chancellor's division of the property.

¶44. It was within the chancellor's discretion to fashion an equitable remedy in dividing the marital property, and we will not second guess the chancellor's decision absent manifest error, which has not been shown.

### 2. Rental Property

¶45. Ralph argues that the chancellor erred in finding that the rental property located on Shiloh Road was marital property. By Ralph's own admission, "[t]he testimony at trial was somewhat conflicting and confusing regarding the rental property's owner of record."

¶46. The property was originally purchased in October 2007 by one of Ralph's businesses, Webb Land & Timber, which eventually became Complete Land & Timber. That same month, Ralph formed an LLC titled "Ralph Frank, LLC." The following month, in November 2007, Ralph Frank LLC entered into a lease-purchase agreement to buy the property. The following July, two months after Wendy and Frank were married, Webb Land & Timber executed a warranty deed for the property to Ralph Franks LLC. On that same day, Ralph executed a quitclaim deed from Ralph Franks to Ralph Franks LLC. Also on that same day, Ralph Franks LLC granted a real estate deed of trust to Land Bank South to secure a loan for $82,500. The promissory note securing the loan was executed by Ralph, Wendy, and Ralph Franks LLC.

¶47. In addition to signing the promissory note, Wendy also testified that she paid Ralph "$600 a month for many, many years" toward the rental property. She and Ralph kept separate checking accounts. Ralph testified that Wendy did not pay anything toward the rental property or assist with maintaining it. He argues that while Wendy initially testified that she contributed toward the rental property, she changed her testimony on cross-examination and stated that the $600 she paid him was for household expenses. Wendy testified on cross-examination, "I gave him $600 a month to pay on either [the second mortgage on the marital home] or the rental property. I don't know what he put it on. That

18

was to help out on the household expenses."

¶48. "Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994). However, absent an agreement to the contrary, nonmarital assets "may be converted to marital assets if they are commingled with marital assets or used for familial purposes." *Heigle v. Heigle*, 654 So. 2d 895, 897 (Miss. 1995).

¶49. Although the property was purchased prior to the marriage, we cannot find that the chancellor abused her discretion in finding that the property had been converted to a marital assets based on the evidence in this record.

### 3.    Fair Market Value of the Ten Acres

¶50. Ralph argues that the chancellor incorrectly valued the ten acres that ran adjacent to the marital home and five acres on which the marital home sat. The chancellor valued the ten acres at $44,690. The final judgment contains a footnote that explains how the value was determined: "Value determined by an average of $38,380 set forth in Current Market Analysis set forth in Trial Exhibit 40 and $51,000 set forth in Trial Exhibit 59. The [c]ourt also considered Exhibit 10 reflecting a value of $45,000 from 10/23/2013."

¶51. Ralph argues that the chancellor erred in relying on the "Current Market Analysis" report prepared for Wendy by a realtor and instead should have only used the $51,000 appraisal. Alternatively, Ralph argues that the chancellor should have averaged the $51,000 appraisal with the $45,000 appraisal, which would result in a value of $48,000.

¶52.    "Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." *Ferguson*, 639 So. 2d at 929.  "A chancellor is responsible for determining the fair market value of the marital assets." *Potts v. Potts*, 204 So. 3d 326, 329 (¶10) (Miss. Ct. App. 2016). It is within the chancellor's discretion to average the appraisals submitted by the parties. *Id.* at 328 (¶7).

¶53.    The "Current Market Analysis" was prepared by Patricia Cooper, a state certified residential appraiser and real-estate agent.  Her analysis included three comparable sales in the immediate market area.  She found that as of March 2022, the approximately 1.75-acre portion of the land with road frontage and the strip of land used to access the back acreage was valued at $5,000 to $8,000 an acre.  She valued the remaining approximately 8.26 acres in the back of the property between $2,000 and $3,000 per acre.  Her report included a disclaimer that it was a suggested current market value and not a formal appraisal.

¶54.    It was within the chancellor's discretion to weigh the valuations submitted by the parties.  We find no abuse of discretion in the chancellor's use of the three valuations to determine the fair market value of the property, and substantial evidence supports the chancellor's determination.

### IV.    Attorney's Fees

¶55.    Ralph argues that the chancellor erred in ordering him to pay $15,000 toward Wendy's attorney's fees, which totaled $15,933 at the start of the trial.

¶56.    "[T]he matter of determining attorneys fees in divorce cases is largely entrusted to the

sound discretion of the trial court." *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982). The award must be supported by the evidence. *Id.* In *McKee*, our Supreme Court set out the following factors for the chancellor to consider in awarding attorney's fees:

> (1) relative financial ability of the parties; (2) the skill and standing of the attorney employed, (3) novelty and difficulty of issues in the case, (4) the responsibility required in managing the case, (5) time and labor required, (6) the usual and customary charge in the community, and (7) whether the attorney was precluded from undertaking other employment by accepting the case.

*Gilmer v. Gilmer*, 297 So. 3d 324, 339 (¶53) (Miss. Ct. App. 2020) (citing *McKee*, 418 So. 2d at 767). Ralph takes issue with only factor one. Ralph argues that Wendy's reported income was inaccurate,[4] and even if she was unable to pay her attorney's fees at the time of trial, she was allowed to withdraw approximately $33,000 from the registry of the court after trial; thus, she "had the ability to pay after the final judgment," according to Ralph.

¶57. Regarding the parties' relative financial ability, the chancellor considered that Wendy's gross income was $2,841 per month, and her reported expenses were $6,240 per month. Ralph's gross income was $6,862 per month, and his expenses were $7,368 per month. He also reported monthly payments of $9,215 on the liabilities section of his financial disclosure. However, the chancellor found it "difficult to decipher Ralph's actual monthly personal expenses" because his "testimony was inconsistent on [his] actual expenses owed and whether they were business expenses or personal expenses. Also, many of Ralph's expenses dealt with third parties making it difficult to decipher Ralph's actual monthly personal expenses." As the chancellor described from the bench, Ralph's "testimony differed

---

[4] As discussed later, we find the chancellor did not abuse her discretion in relying on Wendy's reported income. *See infra* ¶¶69-74.

21

on different days with respect to the same assets, which were financed, refinanced, business deals with different third parties of Mr. Franks . . . ." The chancellor stated, "It was a shell game of trying to figure out and identify what the assets were and to figure out how to place a value on those . . . . I felt like his testimony at times was very deceptive. I felt like that he was untruthful on many occasions."

¶58. "[W]here the record shows an inability to pay and a disparity in the relative financial positions of the parties, there is no error in awarding attorney fees." *Rogillio v. Rogillio*, 101 So. 3d 150, 156 (¶24) (Miss. 2012). The chancellor found that a financial disparity existed between the parties. Wendy earned less than Ralph, and Wendy's expenses "greatly exceed her income." Despite Ralph's reported expenses also exceeding his income, the chancellor found it "difficult to decipher" what portions of Ralph's expenses were personal or business expenses. The chancellor's conclusion is supported by the evidence, and we find no abuse of discretion in the chancellor's decision.

### V. Credit for Payments Made Toward the Marital Home After the Demarcation Date

¶59. Ralph argues that the chancellor erred by not crediting him for the mortgage payments he made on the marital home after the date of the temporary order, which was used as the date of demarcation. Ralph asserts that from the date of the temporary order in March 2020 to the entry of the order compelling the sale of the marital home in June 2021, he paid $9,202.87 toward the principal on the mortgage.

¶60. The chancellor explained that she did not credit Ralph for the payments on the marital home because he was allowed to continue living in the home during this time. Further, the

22

temporary order entered on March 23, 2020, specified that "Ralph will have exclusive use and occupancy of the marital home and will have the responsibility for payment of all debts and expenses associated with the home."

¶61. "[W]here one spouse has the benefit of living in the home, that spouse may not 'necessarily [be] entitled to a share of the proceeds proportionate to the payments [he] made.'" *Selman v. Selman*, 722 So. 2d 547, 552 (¶20) (Miss. 1998) (quoting *Trovato v. Trovato*, 649 So. 2d 815, 818 (Miss. 1995)). "In other words, the spouse who lives in the marital home gains a benefit which must be taken into consideration." *Id.*

¶62. We find that the chancellor did not abuse her discretion in not crediting Ralph for payments made toward the marital home after the date of demarcation when Ralph received the benefit of living in the home.

## VI. Child Support

### 1. Calculation of Child Support

¶63. Ralph and Wendy agreed to share joint physical custody of their daughter, who was fifteen years old at the time of the divorce judgment. To calculate child support, the chancellor used Ralph's adjusted gross income as reported on his financial disclosure, which was $5337 per month. The chancellor then applied the statutory 14% child support guideline for one child. Miss. Code Ann. § 43-19-101(1) (Rev. 2021). This resulted in a support amount of $747 per month. Applying the same 14% statutory guideline to Wendy's adjusted gross income as reported on her financial disclosure, $2,435, the support amount owed by Wendy was $340. The chancellor simply took the difference between these two amount and

23

awarded Wendy the disparity, or $407 per month.

¶64. Ralph argues that the chancellor's determination is contrary to this Court's decision in *Rayner v. Sims*, 228 So. 3d 353, 359 (¶31) (Miss. Ct. App. 2017), where "the chancellor found the statutory percentage, as outlined in section 43-19-101(1), should be adjusted based on the parties' joint custody arrangement, 'in proportion to their periods of shared custody.'" The chancellor then instructed the attorneys for the parties to "do the math." Counsel subsequently submitted an exhibit with proposed calculations, and the exhibit was adopted by the chancellor. *Id.* at n.6.

¶65. Ralph asserts that according to *Rayner*, the chancellor should have reduced the child support amounts owed by each party by half, to reflect the equal division of custody, and then calculated the disparity, which would have resulted in Ralph owing Wendy $203.50 per month in child support ($373.50 minus $170 equals $203.50).

¶66. However, the decision in *Rayner* did not establish a per se rule that child support in joint custody cases must be established this way. "[A]n award of child support is a matter within the discretion of the chancellor and that determination will not be reversed unless the chancellor was manifestly wrong in his finding of fact or manifestly abused [her] discretion." *Williams v. Williams*, 264 So. 3d 722, 726-27 (¶12) (Miss. 2019). "[T]he process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains" an appellate court's review. *Id.*

¶67. We cannot find that the chancellor erred in calculating child support. This issue is without merit.

## 2. Wendy's Income

¶68. Ralph further argues that the chancellor's child-support calculation is incorrect because Wendy's reported adjusted gross income was inaccurate. Wendy owns two businesses, a hair salon and a snowball stand. In her financial disclosure, Wendy provided financial information and tax returns for the year 2020. Ralph argues that Wendy's 2020 tax returns did not accurately reflect her income because mandatory shutdowns of hair salons occurred during the COVID-19 pandemic in 2020, and Wendy testified that she was "down a lot" at work for personal reasons. Thus, he argues that Wendy's 2020 income was likely lower than in other years and not an accurate representation of her income. Ralph filed a post-judgment motion to reopen the record to introduce evidence of her 2021 income. The chancellor denied the motion.

¶69. In declining to require Wendy to produce tax record for other years, the chancellor found:

> [C]learly we all know that 2020 was not a representative year for her. I know you've requested that we reopen the case to get new financial information, but I'm not inclined to do that. To set that precedent would require me to reopen all the cases that I have ruled on in 2020. I'm just not willing to do that. Plus the Court's required to use the figures in place at the time that the trial is ongoing, and so I don't feel like that was an error, and so I'm denying your request on that claim.

¶70. We cannot find that the chancellor erred in relying on Wendy's financial information from 2020, which was the year the temporary order was entered.

¶71. Ralph also argues that Wendy's Rule 8.05 financial statement was "not competent evidence and the court erred in taking it [at] face value" because it was unsigned. However,

Wendy was questioned under oath about her financial statement. In fact, when Ralph's attorney interjected that her testimony as to her debts was irrelevant, Wendy's attorney responded that she was questioning Wendy to establish the truthfulness of her financial statement because it was unsigned:

> I was just going through her 8.05, Your Honor, for truthful because she didn't sign it. That was the truth, and if he's okay with those figures, I'm fine with her just signing it. I do need to go over her expenses, as those debts will be marital debts, but I just noticed that what was in the record was not signed, so I was trying to make sure everything was correct.

The chancellor then suggested, "Why don't we just get it signed? Any objection?" Ralph's attorney had no objection, and Wendy's attorney stated that Wendy would sign the original in the record. But the financial statement marked as Exhibit 1 in the record before this Court is unsigned.

¶72. Regardless, Wendy testified under oath as to the figures in her financial statement, and the chancellor was within her discretion to rely on Wendy's sworn testimony.

¶73. Lastly, Ralph argues that the chancellor should have considered that Wendy claimed a tax deduction of $6,824 for depreciation as a business expense when this "did not actually detract from her income." However, a chancellor may consider depreciation in determining a party's income for purposes of child support. *Nix v. Nix*, 790 So. 2d 198, 200 (¶5) (Miss. 2001). If "the depreciation claimed for tax purposes applied various accelerated standards," then the chancellor would need to take that into account. *Id.* Ralph makes no argument here that the depreciation claimed by Wendy was accelerated. Ralph bore the "burden to show wherein these deductions were not justified, and [he] has failed to do so." *Id.* at (¶4). He

"did not offer evidence . . . that the expenses, as costs of doing business, were illegitimate."

*Id.* This argument is without merit.

¶74. We find that the chancellor did not abuse her discretion in relying on Wendy's 2020 income and her Rule 8.05 financial statement, which was supported by her testimony. This issue is without merit.

## CONCLUSION

¶75. We find no reversible error as to the issues raised by Ralph on appeal. The chancellor's judgment is affirmed.

¶76. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. CARLTON, P.J., NOT PARTICIPATING.**